[Cite as *State v. Ludwick*, 2017-Ohio-8463.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 17AP-235 |
| v. | : | (C.P.C. No. 16CR-2256) |
| Lowell W. Ludwick, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 7, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor.*

**On brief:** *Jeremy M. Dodgion*, for appellant. **Argued:** *Jeremy M. Dodgion.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Lowell W. Ludwick, appeals a March 22, 2017 judgment of the Franklin County Court of Common Pleas sentencing him to eight years in prison for conspiring to have his wife murdered. Because we find that the evidence at trial was overwhelmingly in favor of guilt and that the evidence would not have supported a defense of abandonment, we find that Ludwick's defense counsel was not ineffective for failing to raise abandonment, and that Ludwick's conviction was both sufficiently supported by and not against the manifest weight of the evidence. Because the record is insufficient to conclude that defense counsel failed to investigate Ludwick's apparent gambling addiction, we also cannot conclude that defense counsel was ineffective in failing to sufficiently investigate and present mitigation evidence at sentencing. We overrule all of Ludwick's assignments of error and affirm the judgment of the trial court.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  On April 28, 2016, a Franklin County Grand Jury indicted Ludwick for one count of conspiracy in connection with a plot to hire someone to murder his wife.  (Apr. 28, 2016 Indictment at 1-2.)  A trial began in the case with jury selection on February 6, 2017.  (Tr. Vol. I at 5, filed on May 15, 2017.)  The three witnesses who testified during the trial were the detective who investigated the case, the person who reported Ludwick's attempt to hire a hit man to kill his wife, and Ludwick's wife.

{¶ 3}  The detective testified first.  He explained that on March 7, 2016, someone named Wade Smith called the police department to report a possible murder for hire.  (Tr. Vol. I at 66-67.)  The detective met with Smith the next day on March 8.  (Tr. Vol. I at 68-69.) Smith told the detective that Ludwick (whom he knew professionally through his work as an HVAC salesman) had contacted him on March 7 and the two had met for coffee.  (Tr. Vol. I at 69-71.)  Initially, Smith had assumed that the discussion over coffee would be about HVAC business, but once he got to the coffee shop he stated that Ludwick turned off both his phone and Smith's phone and placed them on an adjacent table.  *Id.*  Then Ludwick confided to Smith that he was looking to hire someone to kill his wife.  *Id.*

{¶ 4}  During the March 8 meeting between the detective and Smith, the detective helped Smith make a controlled telephone call to Ludwick to set up another meeting to discuss the matter further.  (Tr. Vol. I at 75-76.)  On the day of Smith's second meeting with Ludwick, March 10, 2016, the detective provided Smith with an audio and video recording device disguised as an automobile key fob.  (Tr. Vol. I at 76-77; State's Ex. B5.)  The detective also set up surveillance on the coffee shop and took pictures of Smith and Ludwick as they arrived and during the meeting.  (Tr. Vol. I at 77-79, 87-88; State's Exs. A1-A36.)  The detective explained that the two men met for a short period in the coffee shop before changing venue to Ludwick's truck.  (Tr. Vol. I at 81-82.)

{¶ 5}  After the March 10 meeting with Ludwick, Smith met again with police, returned the key fob recording device, and also provided the police with a piece of paper on which Smith had written an address Ludwick had given him "503 Woodland Ct. – West Jeff. – 43162," which was Ludwick and his wife's home address.  (Tr. Vol. I at 83, 85-87; State's Exs. B5, C, D.) After downloading and listening to the contents of the recording device Smith returned to him, the detective contacted the prosecutor's office.  (Tr. Vol. I at 83-84.)  The following day, March 11, 2016, the police contacted Ludwick's wife to warn her

about what they had learned and to protect her against the possibility that Ludwick might have contacted persons other than Smith and successfully hired someone to kill her. (Tr. Vol. I at 84-85.)

{¶ 6} Smith testified next. He confirmed that he knew Ludwick through HVAC business and received an invitation to have coffee in March 2016. (Tr. Vol. I at 107-10.) When he arrived, Ludwick said something to the effect of "let me see your phone." (Tr. Vol. I at 110-12.) When Smith handed it over, Ludwick shut off both his own phone and Smith's phone and placed them on a table six to eight feet away. *Id.* Then he said he wanted his wife gone and did not care how it happened. (Tr. Vol. I at 112-14.) He related that he had considered staging an accident by pushing her down the stairs with her vacuum cleaner. *Id.* He initially offered Smith $20,000 to do it or have someone else do it, but eventually "sweeten[ed]" the deal to $30,000 when Smith seemed reluctant. (Tr. Vol. I at 114-15.) Ludwick told him that his wife was home alone every other Friday and wanted to be sure that he knew the exact date and time that it would happen so he could be sure to have an alibi. (Tr. Vol. I at 115-16.)

{¶ 7} Smith testified that initially his thought was to forget about the conversation and never talk to Ludwick again. (Tr. Vol. I at 116-17.) But after he discussed it with some friends he was advised by them to contact the police; he got in touch with the detective and agreed to meet with the police on March 8, 2016. (Tr. Vol. I at 117-20.) Smith testified that while meeting with the police he called Ludwick and set up another meeting. (Tr. Vol. I at 119-20.) Smith confirmed that he agreed to carry a video and audio recorder shaped like a key fob and did successfully carry the device throughout his second meeting with Ludwick which was held on March 10. (Tr. Vol. I at 121-23.)

{¶ 8} Smith testified that at the March 10 meeting, after making small talk and business talk in the coffee shop for a few minutes, he and Ludwick got into Ludwick's truck. (Tr. Vol. I at 122-23.) Once in the truck, each man turned off his cell phone and placed them on the dash. (Tr. Vol. I at 123-24.) Then they drove around talking for what Smith estimated was 45 minutes to one hour. (Tr. Vol. I at 123-24.)

{¶ 9} The parties stipulated the relevancy of certain portions of the recorded conversation and those portions were played for the jury. (Tr. Vol. I at 138-39, 141-47; State's Ex. D 13:28:00-14:22:48.) Once the two men were in the truck, the recording

indicates that Ludwick led off the conversation by asking Smith if he was currently, or had ever been, associated with law enforcement. (State's Ex. D at 13:35:31-13:35:42.) Ludwick stated that "this [wa]s some pretty serious shit." *Id.* at 13:35:33-13:35:50. Ludwick then asked if Smith had an "answer or solution or could help or something." *Id.* at 13:35:54-13:36:01. Smith said he had a guy who could help, but he cautioned Ludwick, "[h]e scares the fuck outta me, Wayne [Ludwick]. They don't call him Crazy Joe for nothin." *Id.* at 13:36:01-13:36:07. Ludwick responded, "Good." *Id.* at 13:36:05-13:36:07. At that point, Smith laid out what "Crazy Joe" was seeking–a down payment, a picture, and an address. *Id.* at 13:39:32-13:39:44. Before responding, Ludwick (after offering the excuse that he was "pretty nervous") patted Smith down to determine if he was wearing a wire. *Id.* at 13:39:44-13:39:54; Tr. Vol. I at 135-36.

{¶ 10} Then they began to discuss specifics. Smith said "Crazy Joe" was going to have to make it look like a "botched robbery." (State's Ex. D. at 13:40:27-13:40:35.) Ludwick responded that would help "defer attention away from me too." *Id.* at 13:40:32-13:40:35. Ludwick then mentioned that his wife would probably have her wedding rings on which would be worth three to five thousand dollars. *Id.* at 13:40:52-13:41:01. Within ten seconds of mentioning the rings, Ludwick brought up the issue of payment. He said, "[t]his may be a problem and it may nullify it. I don't really have it. My shit's tied up. And if I go take it out for no reason it's not gonna do. If that's a problem, I mean, he's gonna get immediate something that was just talked about." *Id.* at 13:41:12-13:41:32. Smith responded that a down payment was needed to "put the ball in play." *Id.* at 13:41:32-13:41:37. Ludwick assured Smith that he was "serious," but he just didn't have $5,000 for a down payment lying around. *Id.* at 13:41:42-13:41:57.

{¶ 11} Ludwick and Smith reaffirmed that they had previously agreed on $30,000 total for the job. *Id.* at 13:43:25-13:43:31. Ludwick acknowledged the agreement and said that he was not "counteroffering," but that he could "get to five within a week," could do another "five in another week," and then would have to see how things worked out. *Id.* at 13:43:23-13:44:17. Despite consistently maintaining that he could not offer a down payment immediately, Ludwick offered frequent assurances throughout the remainder of the conversation that he could get the total amount very soon after "something happened to her" by "clean[ing] out" the accounts, including her savings, before the matter went to

probate.   *Id.*  at  13:42:28-13:43:23,  13:52:08-13:52:22,  13:53:06-13:53:30,  13:54:26-13:54:48,  13:55:44-13:56:00,  13:58:46-13:59:15,  14:07:22-14:08:00,  14:09:20-14:10:15. This method, he said, would work better if law enforcement was investigating him because he could use the excuse that he was withdrawing money to avoid probate. *Id.* at 14:09:20-14:10:15.  He reassured Smith that "Crazy Joe" would not have to wait for life insurance. *Id.* at 13:55:17-13:55:35.  He offered Smith money "once the deed's done" in order to "incentivize" him to get "Crazy Joe" to do the job.  *Id.* at 14:04:11-14:04:28.  He even went so far as to show Smith a text message from his wife about her recent five-figure bonus and opined that the bonus would be available to pay "Crazy Joe."  *Id.* at 14:06:36-14:08:06; Tr. Vol. I at 152-53.

{¶ 12} Ludwick provided more details to Smith.  He assured Smith that he did not have kids and that there would be nobody else in the house but his wife, and therefore, "no confusion." (State's Ex. D. at 13:47:11-13:47:23, 14:01:38-14:01:48.)  He recited his address to Smith and, after tearing off identifying information from a piece of scrap paper, had Smith write it down on what was left of the paper.  *Id.* at 13:47:30-13:48:28; Tr. Vol. I at 134; State's Ex. C. As he removed the identifying information, Ludwick remarked, "I guess you gotta be paranoid.  Ain't nothin wrong with it, is there?"  (State's Ex. D at 13:47:54-13:47:57.)  He refused to provide a picture of his wife, observing that even if Smith were to delete it later, that "shit never really goes away" and opining that creating an electronic trail like that would be "the dumbest thing in the world."  *Id.* at 14:01:31-14:02:05.  But he described her as "5'9", blonde, * * * big nose, thin, * * * Catholic girl from Indiana.  She's thin, five foot nine, which is relatively tall for a woman.  She's thin, blond, there's only gonna be one."  *Id.* at 14:02:05-14:02:26.  Ludwick lamented that "unfortunately" the deed could not be done quickly and noted that, "tomorrow [Friday, March 11th] was an option * * * but two weeks from tomorrow" would also work.  *Id.* at 13:48:44-13:48:55.

{¶ 13} Ludwick said once this was done he planned to sell the house and move to California in the Fall because he would no longer have any relations tying him to Ohio.  *Id.* at 14:14:12-14:14:25.  He speculated that, "I could do it myself.  Or get a divorce, but then I'd end up with half.  Well who the fuck wants half? I'd still gotta work.  Let's just do it.  Just do the full monty and get it done with."  *Id.* at 14:14:55-14:15:05.  Ludwick closed the meeting by saying he just wanted to get this done and that he had nobody else he would

trust.  *Id.* at 14:15:19-14:15:42.  He had already asked a loyal friend of his father's about it and that fellow had refused, saying he did not want to know anything about it.  *Id.* at 14:15:42-14:16:06.  "This is all or nothin for me," Ludwick concluded.  *Id.* at 14:16:11-14:16:15.

{¶ 14} Ludwick's wife was the last to testify.  She confirmed that she lived in a house in West Jefferson with Ludwick, to whom she had been married for almost 19 years.  (Tr. Vol. I at 174-76.)  She said that they had a normal marriage but fought occasionally about money because Ludwick had cashed in his retirement, squandered his $390,000 inheritance, sometimes got into credit card debt trouble, and gambled excessively. (Tr. Vol. I at 176-82.)  She confirmed that she had approximately $350,000 retirement, $300,000 life insurance, $15,000 to $20,000 in various bank accounts, and her interest in their $475,000 house, all of which would have gone to Ludwick if she had been murdered.  (Tr. Vol. I at 179-83.)  She verified that she had texted Ludwick about her $11,000 bonus during the first week of March 2016.  (Tr. Vol. I at 183-84.)  She agreed that her rings were worth $3,000 to $5,000.  (Tr. Vol. I at 187-88.)  She also corroborated Ludwick's statement that she was off every other Friday and would have therefore been at home on the days Ludwick indicated the hit man should stage the burglary.  (Tr. Vol. I at 184.)

{¶ 15} At the outset of trial, the defense disclaimed any affirmative defenses.  (Tr. Vol. I at 11.)  In opening statement, Ludwick's attorney admitted that Ludwick had not had a "change of heart," but was innocent of the conspiracy offense because he told Smith multiple times that he didn't have the cash for a down payment.  (Tr. Vol. I at 55-56.)  In closing, the defense continued with the same theme–that Ludwick's conduct was deplorable but not criminal because he never finally agreed that the hit man should kill his wife and kept insisting that he could not make a down payment.  (Tr. Vol. II at 249, 253-54.)  In short, the defense argument throughout the trial was that "coming close to committing an offense is not committing an offense."  (Tr. Vol. II at 251.)

{¶ 16} On February 8, 2016 the jury found Ludwick guilty.  (Tr. Vol. II at 284; Feb. 8, 2017 Verdict Form.)

{¶ 17} In preparation for sentencing, the defense submitted a sentencing memorandum that included seven letters from Ludwick's friends and family.  (Mar. 15, 2017 Sentencing Memo., attachments.)  All of the letters were supportive of Ludwick and

five letters specifically implied that Ludwick's actions were at least partially the result of an out-of-control gambling addiction. (Robbins Ltr., West Ltr., B. Fields Ltr., Butler Ltr., M. Fields Ltr., attached to the Mar. 15, 2017 Sentencing Memo.). In the sentencing memorandum, Ludwick's counsel referred to the letters as supporting a theory that Ludwick's purported gambling addiction may have been what caused Ludwick, a ten-year Navy Veteran with no criminal record, to contemplate something so extreme. (Sentencing Memo. at 2-3.)

{¶ 18} At a sentencing hearing on March 22, 2016, counsel for the State read a letter written by Ludwick to his wife from jail in which he declared his love for her, and blamed his addiction, fear over having squandered his inheritance, and lack of mutual communication, for his actions. (Tr. Vol. II at 289-91.) He also said the stress of losing her had brought on Type 2 Diabetes which he was "learning to manage." (Tr. Vol. II at 290.) The State argued that the letter was a manipulative attempt to convince his wife to argue for leniency on his behalf, notwithstanding the fact that he tried to have her killed to get her money. (Tr. Vol. II at 291-92.) Ludwick's wife then addressed the court and opined that her husband had always been someone who felt he was above the law and that rules did not apply to him. (Tr. Vol. II at 295.) She asked the trial judge to "sentence him to the fullest extent possible." *Id.* Ludwick also spoke at sentencing, expressing thankfulness "that it was only a discussion, that nothing took place." (Tr. Vol. II at 299.) He also described himself as having been "consumed with gambling." *Id.*

{¶ 19} The trial court took into account both the serious nature of the offense (hiring someone to kill a spouse of 19 years in order to steal their money) and also Ludwick's military service record and lack of prior criminal convictions. (Tr. Vol. II at 301-03.) In the course of pronouncing sentence, the trial court noted that gambling addiction was evidently an issue and that it had not heard any explanation of why treatment for gambling addiction was never sought. (Tr. Vol. II at 302.) The trial court ultimately sentenced Ludwick to eight years in prison. (Tr. Vol. II at 303.)

{¶ 20} Ludwick now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 21} Ludwick raises four assignments of error for review:

> [1.] APPELLANT WAS DENIED HIS SIXTH AMENDMENT
> RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN

COUNSEL FAILED TO PRESENT AN AFFIRMATIVE DEFENSE.

[2.] APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO PRESENT MITIGATION AT SENTENCING.

[3.] APPELLANT WAS DENIED HIS RIGHT TO DUE PROCESS WHEN THE STATE OFFERED INSUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION.

[4.] THE JURY'S FINDING OF GUILTY WAS CONTRARY TO LAW AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. DISCUSSION

### A. Third and Fourth Assignments of Error – Whether Ludwick's Conviction was Against the Manifest Weight of the Evidence or Insufficiently Supported

{¶ 22} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 23} Sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's Law Dictionary* 1433 (6th Ed.1990). "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 24} By contrast:

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief.*"

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's* at 1594. In manifest weight analysis "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 25} Conspiracy to commit murder is defined in relevant part as follows:

> (A) No person, with purpose to commit or to promote or facilitate the commission of * * * murder * * * shall do either of the following:
>
> (1) With another person or persons, plan or aid in planning the commission of [murder];
>
> (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of [murder].
>
> (B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

R.C. 2923.01(A) and (B).

{¶ 26} Ludwick argues that the evidence shows that he never finally agreed with Smith that "Crazy Joe" should kill his wife because the recording shows that he repeatedly

insisted that a down payment was not possible. (Ludwick Brief at 14-17.) But there was evidence before the jury that Ludwick and Smith explicitly acknowledged an agreement between them for a total murder fee of $30,000 and Ludwick specifically stated he wasn't "counteroffering." State's Ex. D at 13:43:23-13:44:17; 1 Restatement of the Law 2d, Contracts, Section 39. And though Ludwick consistently maintained that he could not offer a down payment immediately, Ludwick offered frequent assurances throughout the remainder of the conversation that he could and would fulfill his responsibility to pay the agreed amount. (State's Ex. D at 13:42:28-13:43:23, 13:52:08-13:52:22, 13:53:06-13:53:30, 13:54:26-13:54:48, 13:55:44-13:56:00, 13:58:46-13:59:15, 14:07:22-14:08:00, 14:09:20-14:10:15.) There was considerable evidence that Ludwick had "[a]gree[d] with another person [Smith]," that Smith would "engage in conduct," of procuring a hit man to "facilitate[] the commission of" the murder of Ludwick's wife. R.C. 2923.01(A)(2). It does not matter that "Crazy Joe" was not real or that Smith really did not intend to help Ludwick murder his wife, because, "[i]t is no defense to a charge [of conspiracy] that, in retrospect, commission of the offense that was the object of the conspiracy was impossible under the circumstances." R.C. 2923.01(D).

{¶ 27} Even if the evidence had not shown an agreement, Ludwick's arguments ignore the entirety of R.C. 2923.01(A). That is, it is also conspiracy for a "person, with purpose to commit or to promote or facilitate the commission of * * * murder," to "plan or aid in planning the commission of [murder]," "[w]ith another person or persons." R.C. 2923.01(A)(1). Ludwick gave his address, described his wife, described when she would be at home, explained how the murderer could be sure she was the only one at home, described how he would pay after she was dead, and endorsed a plan for "Crazy Joe" to murder his wife in a staged botched robbery to help "defer attention away" from himself. *See supra,* at ¶ 9-12. That is a paradigmatic example of planning and aiding in planning the commission of murder. R.C. 2923.01(A)(1).

{¶ 28} The evidence supporting a guilty finding of conspiracy came from Ludwick's own statements that were clearly and audibly recorded and played for the jury. (State's Ex. D 13:28:00-14:22:48.) This evidence was corroborated by Smith's testimony. *See supra*, at ¶ 6-8. The things Ludwick told Smith were, in turn, corroborated by his wife's testimony. *See supra*, at ¶ 14. Further evidence of the method of the investigation and the sequence of

events were detailed by the detective's testimony.  *See supra*, at ¶ 3-5.  The evidence that Ludwick was guilty of conspiracy was not merely sufficient and weighty, it was overwhelming.

{¶ 29}  We overrule Ludwick's third and fourth assignments of error.

### B. First Assignment of Error – Whether Ludwick's Counsel was Constitutionally Ineffective in Failing to Present an Affirmative Defense

{¶ 30}  Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense."  *Id.* at 687.  "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' "  *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689; *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).  " 'To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' "  *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.  The failure to make either showing (deficient performance or prejudice) defeats a claim of ineffective assistance of counsel.  *Bradley* at 143, quoting *Strickland* at 697 (" '[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' ").

{¶ 31}  In this case, the deficient conduct Ludwick alleges was his trial counsel's failure to properly assert a defense of abandonment of the conspiracy.  (Ludwick Brief at 5-6.)  Specifically, he argues that trial counsel could have asserted abandonment but instead incorrectly argued the theory that coming close to committing a crime is not the same thing as committing a crime.  *Id.*  Ludwick asserts that this was a misunderstanding of the law on the part of his trial counsel and that it deprived him of a legitimate defense.  *Id.* at 6-7.

{¶ 32}  Before setting forth defenses, the conspiracy statute includes the following:

(E) * * * In the absence of abandonment, it is no defense to a charge under this section that no offense that was the object of the conspiracy was committed.

R.C. 2923.01(E). The statute then sets forth two affirmative defenses:

(I) The following are affirmative defenses to a charge of conspiracy:

(1) After conspiring to commit an offense, the actor thwarted the success of the conspiracy under circumstances manifesting a complete and voluntary renunciation of the actor's criminal purpose.

(2) After conspiring to commit an offense, the actor abandoned the conspiracy prior to the commission of or attempt to commit any offense that was the object of the conspiracy, either by advising all other conspirators of the actor's abandonment, or by informing any law enforcement authority of the existence of the conspiracy and of the actor's participation in the conspiracy.

R.C. 2923.01(I)(1) and (2).

{¶ 33} It is undisputed that Ludwick never informed "any law enforcement authority of the existence of the conspiracy and of [his] participation in the conspiracy." R.C. 2923.01(I)(2). There is no evidence, nor has it been argued at trial or on appeal, that Ludwick ever made a "complete and voluntary renunciation of [his] criminal purpose." R.C. 2923.01(I)(1). During opening statement, trial counsel expressly stated that it would be "disingenuous to suggest he got a change of heart." (Tr. Vol. I at 56.) Thus, Ludwick's argument on appeal rests on the assertion that he "abandoned the conspiracy prior to the commission of or attempt to commit any offense that was the object of the conspiracy, [] by advising all other conspirators [in this case, Smith,] of [his] abandonment." R.C. 2923.01(I)(2). That is, Ludwick argues that by informing Smith that he did not have the money for a down payment, he was informing Smith that he intended to abandon the conspiracy. (Ludwick Brief at 5-7.) Ludwick argues that we should find the failure by his trial counsel to make this argument at trial to be ineffective assistance. *Id.*

{¶ 34} But that argument is not supported by the evidence. Ludwick first confessed to Smith that he didn't have the cash on hand for a down payment at 1:41 p.m. on March 10, 2016. (State's Ex. D at 13:41:12-13:41:32.) Yet he continued to talk to Smith for another 40

minutes about having his wife murdered. *See, e.g.*, *id.* at 14:21:30. During that time he assured Smith that he was "serious," and no fewer than ten times made statements that promised Smith he could and would pay the full $30,000 agreed upon. *Id.* at 13:41:42-13:41:57, 13:43:23-13:44:17, 13:42:29-13:43:23, 13:52:08-13:52:22; 13:53:06-13:53:32, 13:54:26-13:54:48, 13:55:17-13:55:35, 13:55:44-13:56:00, 13:58:46-13:59:15, 14:03:30-14:03:54, 14:06:36-14:08:06, 14:09:20-14:10:15. During the recorded 40 minutes on March 10, 2016, Ludwick also relayed details about how the murder should occur, including giving his address, describing his wife, describing when she would be at home alone, explaining how the murderer could be sure she was the only one at home, and endorsing a plan for "Crazy Joe" to murder his wife in a staged, botched robbery to help "defer attention away" from himself. *See supra*, at ¶ 9-12. More than 30 minutes after initially mentioning that he did not have cash on hand to make a down payment for hiring his wife's murder that Ludwick remarked, "I could do it myself. Or get a divorce, but then I'd end up with half. Well who [ ] wants half? I'd still gotta work. Let's just do it. Just do the full monty and get it done with." *Id.* at 14:14:55-14:15:05.

{¶ 35} On these facts there is no "reasonable probability" that had the defense of abandonment been asserted, it would have altered the outcome. *Griffin* at ¶ 42, quoting *Bradley* at paragraph three of the syllabus. It is also fair to say that the defense of abandonment "on the evidence that was presented at trial could reasonably have been [considered] futile and it is not generally ineffective assistance to fail to engage in futile tactics." *State v. Oller*, 10th Dist. No. 16AP-429, 2017-Ohio-814, ¶ 62, citing *State v. Ealy*, 10th Dist. No. 11AP-750, 2012-Ohio-3336, ¶ 17; *State v. Bean*, 10th Dist. No. 06AP-208, 2006-Ohio-6745, ¶ 18. Ludwick's first assignment of error is overruled.

### C. Second Assignment of Error – Whether Ludwick was Denied Effective Counsel when his Counsel Failed to Present Mitigation Regarding his Gambling Addiction

{¶ 36} Ludwick argues that his trial counsel was ineffective because he failed to investigate, develop, and present mitigation regarding Ludwick's gambling addiction. (Ludwick Brief at 7-11.)

{¶ 37} Gambling was a consideration during sentencing. In the seven letters presented in mitigation, five specifically provided indications that Ludwick's crimes were at least partially the result of an out-of-control gambling addiction. (Sentencing Memo.

attachments, Robbins Ltr., West Ltr., B. Fields Ltr., Butler Ltr., M. Fields Ltr.) Ludwick's wife indicated that she believed he had squandered much of his inheritance on gambling. (Tr. Vol. I at 182.) The defense sentencing memorandum, despite overstating the extent addressed at trial, also argued the issue:

> A common theme throughout these accounts is [Ludwick's] gambling addiction, which was also discussed at length in trial. Defendant does not offer his addiction as an excuse for what occurred—there is no excuse—but rather, as the most significant factor in explaining how an otherwise upstanding citizen strayed so far from the man he was. As evidenced by the testimonials, [Ludwick] has a support structure in place to address his addiction when he is released from prison.

(Sentencing Memo. at 3.) Ludwick, himself, also mentioned gambling at sentencing when he described himself as having been "consumed with gambling." (Tr. Vol. II at 299.)

{¶ 38} In the course of pronouncing sentence, the trial court noted that gambling addiction was evidently an issue but that it had not heard any explanation of why treatment for gambling addiction was never sought. (Tr. Vol. II at 302.) Consistent with the trial court's comments, Ludwick's argument on appeal turns on the allegation that Ludwick's counsel "did not investigate the *psychological* issues associated with Mr. Ludwick's gambling addiction at all.") (Emphasis added.) (Ludwick Brief at 9.)

{¶ 39} The trial court noted that Ludwick did not attempt to introduce psychological evidence, expert testimony, or evidence regarding any treatment for his asserted gambling addiction. (Tr. Vol. II at 302.) But this does not support the inference that Ludwick's counsel failed to investigate those issues or circumstances. "[W]e cannot infer failure to investigate from a silent record." *State v. Murphy*, 91 Ohio St.3d 516, 542 (2001). Nor can we conclude that evidence that could have been produced from such an investigation about Ludwick's asserted gambling addiction would have supported a "reasonable probability" of a different outcome at trial or sentencing. *See Griffin* at ¶ 42, quoting *Bradley* at paragraph three of the syllabus. It is simply not permissible on direct appeal to add to the record as it comes to us from the trial court. *Morgan v. Eads*, 104 Ohio St.3d 142, 2004-Ohio-6110, ¶ 13 ("[A] bedrock principle of appellate practice in Ohio is that an appeals court is limited to the record of the proceedings at trial."). We cannot speculate about whether counsel

investigated, or even if he did investigate, what such an investigation would have revealed about Ludwick's psychological condition concerning gambling.

{¶ 40} Ludwick's second assignment of error is overruled.

## IV.  CONCLUSION

{¶ 41} The evidence presented at Ludwick's trial was overwhelmingly in favor of guilt and would not have supported a defense of abandonment of a conspiracy to commit murder.  Ludwick's trial counsel was not ineffective for failing to raise the affirmative defense of abandonment.  We cannot conclude, from the limited record available on direct appeal, that Ludwick's trial counsel failed to investigate his gambling addiction appropriately, or that such failure, even if it occurred, may have affected the trial's outcome. We overrule all of Ludwick's assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

————————