[Cite as *State v. Cheatham*, 2025-Ohio-2584.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :          Case No. 23CA17

    v.                            :

                                  :          DECISION AND JUDGMENT
ADAM CHEATHAM,                          :          ENTRY

    Defendant-Appellant.         :

_____

APPEARANCES:

Elizabeth Miller, Ohio State Public Defender, Adam D. Vincent, Assistant
State Public Defender, Columbus, Ohio, for Appellant.

Randy H. Dupree, Jackson County Prosecuting Attorney, Jackson, Ohio, for
Appellee.

_____

Smith, P.J.

{¶1} Adam Cheatham, "appellant," appeals the October 16, 2023

Uniform Sentencing Entry of the Jackson County Court of Common Pleas.

A jury convicted appellant of nine counts of Gross Sexual Imposition

involving three separate victims.  On appeal, appellant raises assignments of

error challenging:  (1) the sufficiency of the evidence supporting his

convictions; (2) the consecutive nature of his sentence; and, (3) the

effectiveness of his trial counsel.

{¶2} Based on our review, Assignments of Errors One, Two, and Three are without merit and are overruled. However, as to Assignment of Error Two, the matter is remanded in order that the trial court may conduct a resentencing hearing. With regard to Assignment of Error Four, we have found merit to appellant's argument concerning Count Three. Accordingly, we vacate appellant's conviction as to Count Three and, in all other respects, overrule the remaining portions of Assignment of Error Four. The judgment of the trial court is affirmed in part and reversed in part. The matter is remanded for proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶3} Appellant was convicted on nine counts as follows:

Count One, Gross Sexual Imposition, R.C. 2907.05(A)(1);

Count Two, Gross Sexual Imposition, R.C. 2907.05(A)(1);

Count Three, Gross Sexual Imposition, R.C. 2907.05(A)(4);

Count Four, Gross Sexual Imposition, R.C. 2907.05(A)(4);

Count Five, Gross Sexual Imposition, R.C. 2907.05(A(4);

Count Six, Gross Sexual Imposition, R.C. 2907.05(A)(4);

Count Seven, Gross Sexual Imposition, R.C. 2907.05(A)(1);

Count Eight, Gross Sexual Imposition, R.C. 2907.05(A)(1); and,

{¶4} Count Nine, Gross Sexual Imposition, R.C. 2907.05(A)(1).[1] Count One involves victim, E.J. Count Two names victim, Z.C. E.J. and Z.C. are teenage males whom appellant allowed to reside with him in March of 2023. The remaining counts pertain to alleged victim, S.R., a female. S.R. was seven or eight years old when appellant and S.R.'s mother began living together and moved from northern Ohio to Jackson County.

{¶5} Upon his June 29, 2023 arraignment, appellant entered not guilty pleas to all counts. The court appointed appellant an attorney who ended up being his counsel throughout the proceedings. The State and defense counsel filed and responded to written requests for discovery. The trial court scheduled a final pretrial to occur on August 30, 2023 with jury trial dates of September 5 and 6, 2023.

{¶6} At the final pretrial, the State made a plea offer and indicated that the State would be arguing for a sentence in the range of nine and one-half years. Appellant rejected the offer, maintained his innocence, and proceeded to trial. On the first day of trial, the State presented testimony from the investigating officer, Lieutenant Rick Zinn of the Jackson County Sheriff's Office, and the three alleged victims.

---

[1] These are renumbered counts. When appellant was indicted in June 2023, the indictment contained 11 counts which included two counts of Corrupting Another With Drugs, R.C.2925.02(A)(4)(b)/R.C. 2925.02(C)(1). After the defense rested, these counts were dismissed.

{¶7} E.J. and Z.C. described inappropriate sexual contact initiated by appellant, and inappropriate conversations, sexual in nature, with appellant.[2] Both male victims testified that the inappropriate sexual contact occurred around the time of two graduation parties which took place at appellant's home in May 2023. The allegations involving S.R. will be discussed more fully below.

{¶8} When the State rested, defense counsel made a Crim.R. 29 (A) motion to dismiss on several grounds. As to the counts involving E.J., and Z.C., defense counsel argued that venue, date, and force or threat had not been proven. As to the remaining counts involving S.R., counsel challenged the sufficiency of the testimony of S.R.'s age and force or threat. The trial court overruled the motion. The parties discussed final jury instructions which would be given. Appellant indicated he wished to testify so the trial court engaged in a colloquy with him regarding his Fifth Amendment right to remain silent and the fact that he would be subject to cross-examination. appellant indicated his understanding.

---

[2] In the interests of brevity, we will not detail the conversations appellant allegedly engaged in with the victims. Generally speaking, both victims testified appellant's comments made them feel awkward and uncomfortable. Both testified: "[Appellant] would say I don't need a girlfriend. He'd do it for me." Appellant's testimony was that any remarks or conversations were engaged in by all the young people who stayed at his home and that anything he may have said would have been misconstrued.

{¶9} After appellant's testimony, the defense rested. The parties gave their closing statements. The trial court gave the final instructions and the jury retired to deliberate. Appellant was convicted on all counts. The trial court scheduled sentencing for October 10, 2023.

{¶10} The trial court sentenced appellant to maximum and consecutive terms, for a total of 27 ½ years in prison. This timely appeal followed. The witnesses' relevant trial testimony will be set forth within.

ASSIGNMENTS OF ERROR

I.    CHEATHAM WAS CONVICTED OF FIVE COUNTS OF GROSS SEXUAL IMPOSITION IN THE ABSENCE OF EVIDENCE LEGALLY SUFFICIENT TO SUPPORT A FINDING OF GUILT IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 1 AND 16, OF THE OHIO CONSTITUTION.

II.   THE TRIAL COURT FAILED TO MAKE PARTICULARIZED FINDINGS MANDATED BY 2929.14(C)(4) TO LAWFULLY IMPOSE CONSECUTIVE PRISON SENTENCES ON CHEATHAM.

III.  TRIAL COUNSEL PROVIDE [SIC] INEFFECTIVE ASSISTANCE THROUGHOUT CHEATHAM'S CASE, IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION.

IV.    CHEATHAM WAS CONVICTED OF FOUR COUNTS OF GROSS SEXUAL IMPOSITION IN THE ABSENCE OF EVIDENCE THAT COULD PROVE THE OFFENSES INDICTED BEYOND A REASONABLE DOUBT IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 1 AND 16 OF THE OHIO CONSTITUTION.

## STANDARDS OF REVIEW - CRIM. R. 29 AND SUFFICIENCY OF THE EVIDENCE

{¶11} Appellant made a Crim.R. 29 motion at the close of the State's case.  Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses."  An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the evidence claim.  *State v. Gonz,* 2024-Ohio-5885, ¶ 9 (4th Dist.); *State v. Webb*, 2023-Ohio-4050, ¶ 42 (4th Dist.); *State v. Tenace,* 2006-Ohio-2417, ¶ 37.

{¶12} Appellant's First Assignment of Error challenges the sufficiency of the evidence supporting proof of force as to Counts One, Two, Seven, Eight, and Nine.  Count One involves alleged victim E.J.  Count Two involves alleged victim Z.C.  Counts Seven, Eight, and Nine pertain to

alleged victim S.R. Appellant's Fourth Assignment of Error challenges the sufficiency of the evidence supporting the date of the alleged occurrences in Counts Three, Four, Five, and Six, which all relate to S.R. Because the standards of review are the same, we will consider the First and Fourth Assignments of Error jointly.

{¶13} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *Gonz*, at ¶ 10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386 (1997). Therefore, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Webb, supra,* quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, superseded by constitutional amendment on other grounds as stated in *State v. Smith,* 80 Ohio St.3d 89, 102 (1997), fn. 4, and following *Jackson v. Virginia,* 443 U.S. 307 (1979).

LEGAL ANALYSIS

Assignment of Error One - Sufficient Evidence of Force

{¶14} Renumbered Counts One and Two allege violations of R.C. 2907.05(A)(1), Gross Sexual Imposition, which provides:

> A) No person shall have sexual contact with another; cause another to have sexual contact with the

offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

{¶15} R.C. 2907.01(B) defines sexual contact as follows:

'Sexual contact' means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

Further, "sexual contact" includes " 'any nonconsensual physical touching, even through clothing, of the body of another.' " *State v. Tullio,* 2025-Ohio-206, ¶ 22 (7th Dist.), quoting *State v. Jones,* 2006-Ohio-5249, ¶ 15 (8th Dist.), citing *State v. Ackley,* 2002-Ohio-6002 (C.P.).

{¶16} "Force" means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.  R.C. 2901.01(A)(1).  *See State v. Torres,* 2023-Ohio-1406, ¶ 47 (4th Dist.). "[T]he use of the word 'any' in the definition recognizes there are different degrees of force."  *State v. Clark,* 2008-Ohio-3358, ¶ 17 (8th Dist.). " '[S]ome amount of force must be proven beyond that force inherent in the crime itself.' "  *State v. Zimpfer*, 2014-Ohio-4401, ¶ 46 (2d Dist.), quoting *State v. Dye,* 82 Ohio St.3d 323, 327 (1998).  However, "[a]ny amount of physical force or threat, however slight, is sufficient to support * * *" a rape

conviction under R.C. 2907.02(A)(2). *State v. Heiney*, 2018-Ohio-3408, ¶ 122 (6th Dist.). "The force element needed to prove the offense of gross sexual imposition is the same as it is for rape." *State v. Biggs,* 2022-Ohio-2481, ¶ 16 (5th Dist.).

{¶17} The Supreme Court of Ohio found the amount of force required to meet this requirement varies depending on the age of the victim and the relationship between the victim and the defendant. *State v. Eskridge*, 38 Ohio St.3d 56, 58 (1988). However, some amount of force must be proven beyond the force inherent in the crime itself. *State v. Dye*, 82 Ohio St.3d 323, 327 (1998).

{¶18] In *Torres,* we recognized that in child-victim cases, *Eskridge* holds that the force need not be overt or physically brutal and that subtle or psychological pressure can cause a child victim to be overcome by fear or duress. *Eskridge,* 38 Ohio St.3d 56, 59; *Torres,* ¶ 55.[3] *See also State v. Burton,* 2007-Ohio-1660, at ¶ 37 (4th Dist.).

---

[3] In the context of appeal of a rape conviction, the Supreme Court has certified a conflict between the Second and Eighth districts concerning the sufficiency of the evidence of force required when a case involves sleeping victims. *See State v. Simmons,* Case No. 2024-1301, jurisdiction accepted on November 27, 2024. In the Second District's opinion in *Simmons,* 2024-Ohio-3036, the appellate court noted the Eighth District's long line of cases holding that where a victim is sleeping at the outset of sexual conduct and thus not aware of the defendant's intentions, the force element of rape is established with the minimal force required to manipulate the victim's clothing in order to facilitate the sexual conduct. *Id*. at ¶ 16. However, the *Simmons* court agreed with this court's decision in *Torres,* which had discussed the analyses in *State v. Wine, 2012*-Ohio-2837 (3d Dist.), *State v. Biggs*, 2022-Ohio-2481, (5th Dist.), and *State v. Moore,* 2022-Ohio-2349 (5th Dist.), and found that, "Even if we were to adopt the Eighth District's reduced level of force for initially sleeping victims as discussed and criticized by *Wine, Biggs,* and *Moore,* the facts [in *Torres*] are distinguishable from the sleeping-child victim cases which require manipulation of

{¶19} In *Burton,* the defendant manipulated both the child victim's clothing and the child victim's sleeping body into a position to facilitate sexual conduct. *Burton* at ¶ 42. We held that "[t]his physical manipulation required force, however minimal, beyond that inherent in the act of rape itself." However, we found that additional subtle psychological factors of control and authority contributed to the finding of force, including:

> the victim's will was also overcome by Burton's relative size and age, by the victim's fear resulting from his lack of understanding of an orgasm and his high level of intoxication, and by Burton's position of authority established via his law enforcement officer training, his ability to drive, his relationship with [the victim], and his ability to provide the victim with an expensive gift. *Id.* at ¶ 39.

{¶20} In sum, the evidence regarding E.J. and Z.C. generally demonstrated that the two teenagers lived with another friend, H., and H.'s grandmother until they went to live with appellant in March of 2023. At that time, other young people including H., S., and G. lived with Appellant. According to Z.C., he met appellant through H., and appellant invited the young people to move in to help pay the bills. Appellant had a bedroom. H. and S. also had rooms. E.J. and Z.C. slept on the floor in appellant's downstairs living room.

---

clothing and something more, such as moving the victim or repositioning the victim's limbs." *Torres,* at ¶ 32.

{¶21} Z.C. graduated from both Buckeye Hills Career Center on or about May 18, 2023, and from Jackson High School on or about May 26, 2023. Appellant provided alcohol on weekends and for graduation parties at his house after both graduations. Z.C. recalled the parties occurring on Friday nights. Both Counts One and Two involving the teenage male victims allege sexual contact occurring on or about May 26, 2023. While E.J. testified to multiple occurrences of sexual contact during the time he lived with appellant, Z.C. testified to only a single incident occurring after the Buckeye Hills graduation party. Both victims denied conspiring to wrongfully accuse appellant.

Count One - E.J.'s Testimony

{¶22} Count One alleges that on or about May 26, 2023, appellant purposely compelled E.J. to submit to sexual contact by force or threat of force. Appellant argues that there was no evidence of force presented at trial. Appellant asserts that E.J.'s testimony on these allegations is "murky at best." For the reasons which follow, we disagree. We find that any rational trier of fact could have found proof of force beyond a reasonable doubt.

{¶23} E.J. was 15 years old in May of 2023. While staying at appellant's home beginning in March 2023, E.J. woke up "multiple times"

with appellant lying next to him on the floor.  Appellant made "some dumb excuse" to lay down with him.  Appellant's hands would touch E.J.'s testicles and penis over his clothing.  E.J. did not say anything to appellant, "I just got up." Appellant's sexual contact with E.J. nearly always started with E.J. being asleep.

{¶24} E.J. stayed at appellant's house, despite the inappropriate touching because appellant lived in Jackson.  E.J. testified, "I can't walk from Beaver Pike where I live, that's twenty miles, fifteen miles" to get to school.  E.J. did not tell anyone what was happening because he was scared.

{¶25} E.J. described a painful incident of being touched over his clothing, which included touching his thigh underneath his clothes, as follows:

> It was the time he went and came down and said he was cold and then after that I got up and went to the other room and he came to the other room and went and laid beside me when I was sleeping and I woke up to my balls hurting… [j]ust like getting hit in the nuts.

 E.J.'s testimony is somewhat unclear as to time frame, noting that the sexual contact occurred near the time of the graduation parties.  E.J. denied asking for or consenting to appellant's sexual contact.  Appellant's behavior made him feel "very uncomfortable" and betrayed.

{¶26} Z.C.'s testimony indicates E.J. finally told E.J.'s mother about what was happening with appellant after the Jackson graduation party, which would have been on or about May 26th.  According to E.J., his mother was "very, very mad and sad…She cried for like ten minutes…"  E.J. retrieved his belongings from appellant's house and left that evening.  Prior to telling his mother, E.J. had never discussed appellant's behavior with Z.C.

{¶27} On cross-examination, E.J. admitted he was unsure of the dates of the graduation parties.  When defense counsel attempted to pinpoint the time frame of the sexual contact, "So which is it?  It happened before or it happened at the party," E.J. replied, "Oh it happens every weekend."  E.J. admitted he went to school, "most of the time."  E.J. denied any discussion with appellant about "paying rent, paying bills, getting a job," or in the alternative, "getting kicked out."  E.J. admitted he did not provide any money toward the bills.

Count Two - Z.C.'s Testimony

{¶28} In May 2023, Z.C. was 17 years old.  The gross sexual imposition count involving Z.C. also alleged sexual contact by force or threat of force, on or about May 26, 2023.  Appellant usually came home from work around 3:00, 3:30, or 4:00 p.m. and then "hung out" with the group or young people living with him, playing basketball and video games.

They also had fires and drank alcohol. Appellant went to bed according to his work schedule.

{¶29} According to Z.C., on the night of the Buckeye Hills graduation: "I just woke up because I felt like there was something right on top of me and I woke up and it was [appellant] right on top of me." Z.C. was laying on his back and "half of [appellant's] body was on top of mine…[appellant's] hands were on top of my testicles but it was on the outside of the clothing." Z.C. described his reaction:

> I didn't know what to do so I just got up and I went to the other room into the dining room to go back to sleep and then I woke back up and he was right back beside me….[H]is body was just…just on top of me again.

Z.C. denied asking appellant to lay next to him or consenting to any touching. When it happened, they did not speak.

{¶30} Appellant's actions made him for "lost for words like." Z.C. did not tell anyone else because he thought it was happening only to him, and "I thought everyone called me a liar and I didn't know how to tell anybody about it." Z.C. acknowledged that he continued to stay at appellant's house after the Buckeye Hills party because he "didn't really want to go live back with my grandma because me and my sister really didn't get along and I had a lot more space there, over there."

{¶31} After Jackson's graduation, Z.C. was with his grandparents, who later dropped him off at appellant's house. Z.C. explained, "[T]hey was already drinking so I just started drinking and then like a few hours later my buddy [E.J.] just, he wasn't acting right and then he finally told his mom what happened." Z.C. testified, "And that's when I said something when [E.J.] said something." E.J.'s mother confronted appellant and then they all left. E.J.'s mother reported appellant's behavior and that's when Z.C. also spoke to Lieutenant Zinn.

{¶32} On cross-examination, Z.C. admitted that appellant was going to have "us help pay, help for rent." Z.C. admitted he was unemployed at the time and had not given appellant any money for rent or bills. Z.C. denied that appellant told him he would have to leave if he did not help pay rent.

Appellant's testimony as to Counts One and Two, E.J. and Z.C.[4]

{¶33} In March 2023, S.R. and her mother had moved out so that S.R. could get established in her own place and her mother could help her for a few months. H. and G. moved in with appellant to help pay bills.

---

[4] Appellant's testimony was lengthy and rambling. We have attempted to condense the testimony while also providing some sense of its "flavor" that the jury experienced.

"Then I could save money that was at least the plan." When H. and G. started staying there, they brought S., Z.C., E.J., E.J.'s brother and girlfriend, their mother, their friend J. and "just other people I didn't know." Appellant let the other people stay, under protest. He worked five days a week and the others were really loud. In May, the hours he worked varied because of a project. He did not drink on work nights. He recalled that Buckeye Hills' graduation was Thursday, May 18, 2023.

{¶34} Appellant spoke to Z.C., E.J., and the others about possibly staying at their own residences during weeknights but they wanted to be at his house playing games. According to appellant:

> [S]ome nights [Z.C.] would leave and go …drinking, he would go drinking with other people and then…those would be the nights that he wouldn't be there and E.J. would do the same…[E]ven around that time…in the end of April beginning of May there was still a lot of issues because…people were chasing E.J. to the house at that time…[T]hey were teens, some of them were teens, two or three carloads of teenagers but some were also adults. So, they would chase him into the house…I didn't know what to do. I mean, try to tell them to leave and it was…it was a difficult time.

By May, appellant had gotten E.J. and Z.C. job interviews. He told them, by the time of Jackson's graduation, that "[T]his is the last week anybody can be here without a job."

{¶35} After the Buckeye Hills' ceremony, festivities, and picture-taking occurred,  Z.C. gave appellant $20.00 of his graduation money for gas or "to just help."  Z.C. and E.J. did not stay at his house on the night of Thursday, May 18.  Appellant testified he did not "really recall that night much."  As to the night of May 26th:

> [W]e had a big bomb [sic] fire going plenty of wood…E.J. and Z.C…were gone… They ended up showing up later,…already intoxicated…it was E.J., Z.C. his mom, their friend J.,E., E's girlfriend and…a couple unknown males.  I didn't know who the other people were…[O]nce they pulled up they all come into the house…[E.J.'s] mother was hanging all over me. She began to flirt heavily….[S]he grabbed me everywhere, whatever.  I mean, this was common with these people. This is how they were…[E.J.] noticed as…as the night went on , he began to…give me really angry looks about this.  Right.  [F]inally, at towards the end of the night, I had left to go get some pods?...[B]y the time I came back, fighting had already started.  E.J. had attacked H.  He was intoxicated…He would always fight other people when he drank…[T]hen as not even within ten minutes he got mad at me.  Fifteen minutes…saying I grabbed his mom. Then…they jumped me.  And then after that everybody left…It was like six of them.

Appellant testified that Z.C. and E.J. came back to gather their things and "took stuff that didn't belong to them."

{¶36} Appellant denied placing his hands on E.J. or Z.C.'s private areas, grabbing their testicles, or inappropriately touching them at any time

around May 18 and May 26.  Appellant explained that the situation could

have been misconstrued:

> [A]bsolutely, I would think…[E.J.] was the type you know, get strong, you know, look at me.  I'm built.  He's built.  Feel my leg, grab my leg, you know, things like that, he would always do that.  [T]here was one time when we was fishing, he did that and lost balance and he…all of his stuff rubbed up against me…I kind of looked and said, "are you okay, man" and to him he, he just kind of smiles at me.  [Z.C.] because I was teaching him how to drive.  He was…trying to get his license.  He kept dropping his vuse under his butt, kept doing that like a third, fourth time because I kept reaching up under there and grabbing it.  So, the fourth time I grabbed it.  Like, the fourth time I did it, he sits on my hand.  And all my hand goes right up under, I just, I mean this is the kind of stuff that…and you know, there's a lot there…with these guys with the way they behaved their…the way they talk, you know, they're young men.. They're boys, right?...[S]o maybe they misconstrued some of those things but amongst each other it was even worse.

{¶37} Appellant denied making sexual comments to the boys, said

they were "absolutely" lying.  Appellant testified that E.J. wanted him to

touch him.  E.J. "asked me specific places to measure on his leg or arm or

shoulder or side, wherever he was asking at that point in time but I didn't

feel comfortable with it…I told him I didn't want to be touching him like, I

didn't want to touch him and then have him telling people I touched him.  I

told him that specifically."  Appellant also testified Z.C. would "do some

very odd things."

{¶38} Appellant testified on redirect:

Q:    [I]s there more than one reason why you
      wouldn't touch E.J. when he would ask you
      to?

A:    More than one reason?

Q:    If I may, you had answered to, the
      prosecutor here that you wouldn't touch E.J.
      because you didn't want him to tell others.
      Are there other reasons?

A:    [W]ell, I mean, the most important one is an
      inappropriate question for him to even ask
      me in the first place…and, and, and I , that's
      what I would tell him.  Why, why? I don't
      understand.  And then he would get mad
      because I wouldn't assess his muscle.

Q:    And the same for Z.C. there is more than
      one reason why you wouldn't touch Z.C. if
      he had requested you to?

A:    I mean, it would be the same. I mean, it's
      inappropriate of course, you know, he
      shouldn't,…. I mean he can choose what he
      wants to do as a young man. [B]ut in this
      town, I've been here for twelve years it's not
      as if I haven't had young men approach me
      in this manner more than once in this town.
      It's happened.

{¶39} On recross, appellant testified:

Q:    When Ms. Reno asked you why if there
      were any other reasons why you wouldn't
      touch when it came to E.J., you said, "well
      because he should ask.  It's inappropriate for
      him to ask." Uh, do you not think it would

be inappropriate for you to touch? At nowhere in any of these answers did you say because it would be inappropriate for me to touch this person…

A:      I think that would be a general statement, not only is it inappropriate to ask, it's an inappropriate actions, it's not only an inappropriate request.  It's an inappropriate request to make.

Q:      And so the request, his asking is the inappropriate thing?

A:      Well, both would probably be inappropriate I would think. Absolutely, because he's at his best, he's only fifteen.

Q:      Same with Z.C., so if he were a little bit older, it would be okay?

A:      I mean, if he was a grown person, why not? I mean if they ask, if a grown man or grown woman asked you to touch them or, you know, feel their muscle, I mean, I would think that a little different.

Q:      [A]nd when it came to Z.C., you kind of gave a similar answer of he shouldn't do it when asked.  You didn't say, I shouldn't do it or I shouldn't touch or it would be wrong for me to touch both with E.J and Z.C. it was more about what they did, that would make it wrong.  So, you don't think, just to make it clear, you do think the touching would be wrong?  The touching itself?

A:      Yes, it absolutely, I do.

Q:      [Y]ou said that, since you've been here had

numerous young males approach you.  Is
that like in an inappropriate way? In a sexual
way?

A:     … I've seen this kind of behavior.

Q:     The kind of behavior of young males
wanting you to do something with them?

A:     To, app, yeah, yeah, yes…

Q:     But you said, it's happened, it's happened
more than once to you , you had said?

A:     Yeah, I mean, it had. It has. I mean, I'm, I'm
in jail. You know there's young men over
there. You think they're not grabbing my
butt? You think they're not grabbing my
genitals?

{¶40} As to Count One, appellant argues that sufficient evidence of

force was not presented because while there was testimony of repeated

occurrences of alleged inappropriate touching:  (1) the alleged physical

contact itself was not forceful; and, (2) appellant and E.J. did not have a

relationship in which there was a power dynamic between them.  We

disagree.  As noted above, there are different degrees and manners of force

used in various crimes with various victims.  *Burton,* at ¶ 37.  And, when a

victim is initially asleep when the conduct or contact begins, the state may

satisfy its burden with evidence of only minimal force required to

manipulate the victim's body or clothing to facilitate the sexual assault. *Id.* at ¶ 38.

{¶41} First, E.J. testified he woke up to pain in his testicles, like he had been "hit" after appellant laid down beside him while he was sleeping. In *State v. Burkholder,* 2013-Ohio-1589, ¶ 29 (6th Dist.), the appellate court found sufficient evidence supported the jury's finding of rape where a nine-year-old victim reported pain, the jury was permitted to infer that there had been penetration. Merriam Webster's online dictionary defines the verb "hit" as 1(b): "to come in quick forceful contact with" and 2(c): "to apply forcefully or suddenly." *See* https://www.merriam-webster.com. Here, it may be reasonably inferred that appellant, who sought out E.J. and lay down beside him, touched E.J.'s testicles "forcefully" enough that E.J. woke up in pain.

{¶42} Furthermore, the evidence shows an imbalance of power in the dynamic between E.J. and his unofficial "landlord," appellant. E.J., aged 15, prior to moving in with appellant, was not living with his parents or even other family members. E.J.'s previous residence was with his friend H.'s grandmother. Apparently E.J. had nowhere else to sleep and nowhere else conducive to attending school. It may reasonably be inferred that E.J.'s options were limited, and appellant controlled E.J.'s ability to have both

shelter over his head at night and a shorter walk to school.  These are subtle factors demonstrating appellant's control over E.J.[5]

{¶43} Based on the foregoing, any rational trier of fact could have found evidence of force beyond a reasonable doubt when appellant engaged in unwanted and unlawful sexual contact with E.J.  Appellant's argument as to Count One is without merit.

{¶44} As to Count Two, Z.C. testified that after the Buckeye Hills graduation party, he, lying on his back, awoke to "half [appellant's] body on top of his."  Appellant's hands were on Z.C.'s testicles, on top of the clothing.  Z.C. got up and went into another room.  Appellant argues this evidence is insufficient to demonstrate any amount of force.  We disagree.

{¶45} We are mindful that at the time of the contact, Z.C. was 17 years old, still a minor.  Unlike E.J., there is no mention of Z.C. even having any family members, only that prior to living with appellant he lived with H's grandmother.  It may reasonably be inferred that Z.C.'s options were also limited, and that therefore, appellant was able to exert some degree of subtle, psychological control over Z.C., evidenced by his testimony that he "felt lost."

_____

[5] *See also State v. Stevens*,2023-Ohio-4683, ¶ ¶119-120 (6th Dist.), ("Force" proven where appellant, in addition to other factors, supplied unrelated victim's "basic needs of food, and at times, shelter."

{¶46} The only other evidence of physical force is the testimony that "half [appellant's] body was on top of his" when Z.C. awoke to find appellant touching his testicles. It would have been helpful if the record had provided some evidence regarding Z.C. and appellant's comparable size and strength. However, even assuming that appellant was a small in stature adult and weighed less than Z.C., common sense would dictate that appellant's body on top of Z.C.'s constituted some degree of force, even if very slight. Appellant's argument as to Count Two is also without merit.

Counts Seven, Eight, and Nine - S.R.'s Testimony

{¶47} Generally, S.R. testified that her mother, brother, and she lived with appellant for 12 years. S.R. was seven or eight years old in 2012 or 2013 when appellant and her mother moved to Jackson County. They resided at various addresses in Jackson County. One address, on Church Street, was a one-bedroom apartment.

{¶48} Appellant, S.R.'s mother, and S.R. slept in one bed. The sexual contact occurred in bed, while S.R.'s mother was sleeping or at work. Appellant initiated contact by getting into bed and lying next to S.R. S.R. testified that most of the time appellant touched her butt with his penis and hands, but "there were a few times when it was my vagina." S.R. testified, "I feel like half the time I was sleeping."

{¶49} Appellant touched S.R. inappropriately, and regularly, from ages 9 through 15. S.R. told her mom the first time when she was 10, but it continued. Appellant touched S.R.'s vagina or butt when she was 11. Appellant touched her with his hand or penis when she was 12. When S.R. was 12, she was asleep and woke up to appellant using her hand to touch himself, the first skin to skin contact. Another time when S.R. was 12, appellant put his penis on her leg. When asked how many times appellant touched her, S.R. replied, "I would say probably about a hundred."

{¶50} S.R. told her mother multiple times, but her mother told her not to tell anyone else. At age 13, she asked her mother about seeing a therapist. Her mother prevented it. At 16, S.R. wanted to go to a hospital for her mental health and depression. Instead she was taken to the police. S.R. thinks the police didn't investigate but transferred the matter to Child Protective Services (CPS). After CPS left, appellant called her a liar. However, the sexual contact stopped.

Appellant's Testimony

{¶51} Appellant testified his relationship with S.R. had always been "tempered…[s]he didn't feel because I wasn't her father that I could tell her anything." He did not speak to her since around age 12-13, except to say "hi" or "bye" and give her or her friends a ride. He avoided her because of

the arguments that she had with her mother when she was 12-13 about S.R.'s

girlfriend, aged 17-18.  Appellant did not like that the girlfriend was coming

over and they "were always behaving inappropriately."

{¶52} Appellant denied inappropriate touching in 2014, 2015, 2016,

2017, 2018, 2019, or 2020.  He denied touching S.R. on the butt or vaginal

areas or making her use her hand to touch his penis.  When appellant was

questioned as to whether he thought S.R. wanted him to touch her, he

testified:

> I don't know what S.R.'s. was in her mind. I
> mean, I raised her ever since she was a little girl.  I
> used to bounce her on my lap just like my son.

{¶53} When asked whether S.R. misconstrued things, he testified:

> But she didn't like sleeping in her own bed. So,
> she would always be laying in my bed or she
> would, uh, ask her mom to come lay with her or
> she would ask me to come lay with her.  She
> would.
>
> Q:    And you think that could have been taken
>       the wrong way by her? You laying next to
>       her?
>
> A:    I don't know what she was thinking. …
>
> Q:    You believe that these three individuals that
>       different, especially the two of them far
>       apart in time made false sexual allegations
>       against you, independent of one another to
>       get back at you for something? Or for
>       because they were mad at you for

something, or, I mean, that is what you believe?

A:     I mean, it seems that way in certain cases, in certain ways, yes. It seems that way because, I mean, that night I told you guys, hey this is the last time you guys can be here and then the next thing you know, I'm indicted and being arrested.  S.R. at the time I told her I didn't want that girl around, and them not to do what they were doing and she goes to her mother and it's a big old fiasco and argument, that's when she was twelve.

{¶54} Appellant was convicted under R.C. 2907.05(A)(1) for contact occurring with S.R. in calendar years 2018 (Count 7); 2019 (Count 8); and 2020 (Count 9).  The trial court gave the following instruction regarding force:

FORCE OF A PARENT OR OTHER AUTHORITY FIGURE

        When the relationship between the victim and the defendant is one of child and parent or other authority figure, the element of force need not be openly displayed or physically brutal.  It can be subtle or slight, and psychological or emotionally powerful. Evidence of an express threat of harm or evidence of significant physical restraint is not required. If you find beyond a reasonable doubt that under the circumstances in evidence, the victim's will was overcome by fear, duress, or intimidation, the element of force has been proved.

{¶55} Appellant argues that the evidence adduced at trial does not establish that there existed a parental (or comparable) relationship between S.R. and himself during the years 2018, 2019, and 2020.  He cites S.R.'s

cross-examination testimony that he only "tried" to parent her. Appellant argues there is no evidence that S.R. and he shared any "special relationship," or that appellant held any place of authority over S.R., simply because appellant had lived with S.R.'s mother from a young age. We disagree.

{¶56} Count Seven alleges sexual contact occurring January 1, 2018 through December 31, 2018. During that time frame, S.R. would have been 12 years old until May 14. After that, she would have been 13. While S.R. did testify to specific occurrences at age 12, she also testified to sexual contact from ages 9 through 15. Nothing about Count Seven limited the allegation of sexual contact to occurring only at age 12.

{¶57} Count Eight alleges sexual contact occurring January 1, 2019 through December 31, 2019. During that calendar year, S.R. would have been 13 and then 14. Count Nine alleges sexual contact occurring January 2020 through August 2020. During that year, S.R. would have been 14 and then 15. S.R.'s testimony at age 18 that appellant "tried" to parent her does not resolve the question of whether appellant had subtle, psychological control over her years earlier.

{¶58} Appellant testified that he "raised her since she was a little girl." S.R. had lived with appellant since she was seven or eight years old.

In *State v. Kennedy,* 1990 WL 84286, the Eighth District analyzed the *Eskridge* factors and found that the defendant's position of authority over his unrelated victim derived from his "status as the longtime [live-in] companion" of the victim's aunt and "created a situation in which it was unnecessary for defendant to use brutal force to effect his purpose." *Kennedy*, at*3. Given that S.R.'s mother did nothing to take S.R. out of the dangerous situation when her ten-year-old daughter reported appellant, and instead, told S.R. not to talk about it, refused to get S.R. mental health counseling, and refused to report appellant, we find sufficient evidence of subtle and psychological force, given appellant's long-time position in S.R.'s household. Appellant's argument as to Counts Seven, Eight, and Nine are also without merit.

       Assignment of Error Four - Sufficient Evidence of Time Frame

{¶59} Appellant argues that the State failed to present evidence from which a rational trier of fact could determine beyond a reasonable doubt that the contact described in Counts Three, Four, Five, and Six occurred in each specific year as charged in the indictment. Again, S.R.'s date of birth is May 14, 2005.

{¶60} "An indictment charging sexual offenses against children 'need not state with specificity the dates of alleged abuse, so long as the

prosecution establishes that the offense was committed within the time frame alleged.' " *State v. Neal,* 2016-Ohio-64 (4th Dist.), ¶ 24, quoting *State v. Czech*, 2015-Ohio-1536, ¶ 14 (8th Dist.).  Ohio courts have repeatedly recognized that the time and date of an offense is ordinarily not required in an indictment, but the state must still establish that the offense charged occurred within a reasonable time in relation to the dates fixed in the indictment.  *Neal, supra,* citing *State v. McIntire,* 2015-Ohio-1057, ¶ 42 (6th Dist.), citing *State v. Dodson,* 2011-Ohio-6222, ¶ 40 (12th Dist.).  *See also State v. Green*, 2004-Ohio-5089, ¶ 16 (4th Dist.) ("the prosecution was not required to prove the exact date of the offense because the date is not an element of the offense.  However, the prosecution is required to prove beyond a reasonable doubt that the incident occurred within the time frame specified in the indictment").

Count 3 - S.R.

{¶61} The details regarding the alleged sexual contact are set forth fully above.  Count Three of the indictment alleges sexual contact between January 1, 2014 and December 31, 2014.  For the first part of 2014, S.R. was eight years old.  S.R. testified appellant touched her the first time, with his penis under his clothing "on her back butt" when she was nine years old, and they lived in apartments on Church Street.

{¶ 62} In *Neal, supra*, Count Five of the indictment charged Neal with unlawful sexual conduct with a minor "on or about the 10th day of June, 2013." However, this court found that the State failed to prove beyond a reasonable doubt that the offense occurred within a reasonable proximity to that time period. In *Neal,* the victim testified that she thought that the incident alleged in Count Five occurred sometime in 2013 before the final two incidents, which occurred on June 13, 2013, and that she thought it was snowing at the beginning of the day. Based on our review, the evidence indicated that the incident might have occurred during early 2013, when snow was likely, and not around June, when it was unlikely. The State did not seek to amend this charge to conform to the evidence introduced at trial. Therefore, we found that the State failed to establish by sufficient evidence that the charged offense occurred within the alleged period.

{¶63} Similarly, here there is no evidence beyond a reasonable doubt to establish that the incident alleged in Count Three occurred within a reasonable proximity to May 14, 2005, when S.R. was nine years old. We find appellant's argument as to Count Three has merit.

Counts Four and Five - S.R.

{¶64} Count Four alleges sexual contact occurring January 1, 2015 through December 31, 2015. During this time period, S.R. was nine and

then ten years old. Count Five alleges conduct occurring January 1, 2016

through December 31, 2016. During this time period, S.R. was 10 and then

11 years old. Appellant argues there is insufficient evidence that sexual

contact occurred when S.R. was 10 years old. We disagree.

{¶65} As noted above in *Neal,* an indictment charging sexual offenses

against children need not state with specificity the dates of alleged abuse, as

long as it is established that the offense was committed within the time

frame alleged. *Id.* at ¶ 24. The court in *State v. Yaacov,* 2006-Ohio-5321,

(8th Dist.), observed at ¶ 17:

> This is partly due to the fact that the specific date
> and time of the offense are not elements of the crimes
> charged. *State v. Gus,* 2005-Ohio-6717, ¶ 6 (8th Dist.).
> Moreover, many child victims are unable to remember
> exact dates and times, particularly where the crimes
> involved a repeated course of conduct over an extended
> period of time. *State v. Mundy,* 99 Ohio App.3d 275, 296
> (2d Dist. 1994); *see State v. Robinette,* 1987 WL 7153, *3;
> *State v. Barnecut,* 44 Ohio App.3d 149,152 (5th Dist.
> 1988). "The problem is compounded where the accused
> and the victim are related or reside in the same household,
> situations which often facilitate an extended period of
> abuse." *Robinette, supra*. Thus, "an allowance for
> reasonableness and inexactitude must be made for such
> cases considering the circumstances." *Id.; Barnecut,
> supra* at 152.

{¶66} Appellant characterizes S.R.'s testimony as to the incidents as

"scattershot." As noted, S.R.'s general testimony was that sexual contact

happened to her regularly between ages 9 to 15, "probably about a hundred

times."  S.R. testified that she told her mom what was happening when she was 10 years old.  According to S.R, her mother said, "She'd talk to him about it," but the contact continued.  S.R. testified she continued to tell her mom, "At first, I would tell her every time but once I realized she didn't really care, I stopped telling her as often.  S.R. also testified that appellant touched her vagina or butt when she was 11 years old.  S.R. testified that most of the time, he touched her butt with his penis and hands, but "there were a few times when it was my vagina."

{¶67} While S.R.'s testimony is not specific as to times, this is exactly the type of case discussed in *Yaacov,* where abuse was repeated over an extended period of time and within the household S.R. lived.  *See also State v. McKinney,* 2024-Ohio-4642 (4th Dist.) (Where victim testified defendant sexually assaulted her "close to a hundred or over" times, even without description of each event in excruciating detail, testimony contained ample evidence that defendant committed distinct acts of rape).  Furthermore, appellant does not fit the exception to the general rule, also discussed in *Yaacov* at ¶ 18, "when the failure to allege a specific date 'results in material detriment to the accused's ability to fairly defend himself, as where the accused asserts an alibi or claims that he was indisputably elsewhere during part, but not all, of the interval specified,' " quoting *State*

*v. Sellards*, 17 Ohio St.3d 169, 171 (1985).  As in *Yaacov,* appellant's ability to defend himself has not been prejudiced due to the failure to demonstrate specific dates.  Appellant's defense strategy was to deny all allegations of sexual contact and maintain his innocence.

{¶68} Based on the foregoing, we find no merit to appellant's argument with regard to Counts Four and Five.

Count Six - S.R.

{¶69} Count Six alleges sexual contact occurring January 1, 2017 through December 31, 2017.  During this time S.R. was 11 and then 12 years old.  While S.R. testified about specific skin to skin contact occurring when she was 12 years old, nothing in Count Six limits the sexual contact occurring when S.R. was 12 years old.  S.R. testified to contact occurring "probably 100 times" between ages 9 to 15.  Given the ongoing sexual abuse S.R. experienced in her household from ages 9 to 15, we find any rational trier of fact could have found evidence beyond a reasonable doubt of sexual contact occurring in the calendar year of 2017.  Appellant's argument as to Count Six is without merit.

{¶70} Based on the foregoing, we find appellant's argument with regard to sufficient proof of date to be without merit as to Counts Four, Five, and Six.  However, his argument as to Count Three has merit.  Therefore, we

vacate his conviction as to Count Three.  Assignment of Error Four is

sustained in part and overruled in part.

ASSIGNMENT OF ERROR TWO - CONSECUTIVE SENTENCE

{¶71} Upon appellant's conviction on all nine counts, the trial court

imposed the maximum sentence for each count and ordered the sentences to

run consecutively for a total prison term of 27 ½ years.  Appellant argues

that the trial court failed to make particularized findings mandated by R.C.

2929.14(C)(4) in order to lawfully impose his consecutive sentence.

Appellant concedes that the trial court specified orally and in writing that it

"considered all the sentencing factors and revised code sections 2929.11 and

2929.12," however, appellant points out that the trial court made no mention

of R.C. 2929.14 at the sentencing hearing or in the Uniform Sentencing

Entry.  Therefore, appellant concludes that his sentence is contrary to law

and should be vacated and remanded.

STANDARD OF REVIEW - FELONY SENTENCING

{¶72} When reviewing felony sentences, appellate courts apply the

standard set forth in R.C. 2953.08(G)(2).  *State v. Hill,* 2025-Ohio-798, ¶ 30

(4th Dist.); *State v. Spencer,* 2024 Ohio-59, ¶ 13 (4th Dist.).  R.C.

2953.08(G)(2)(a) provides that "[t]he appellate court's standard for review is

not whether the sentencing court abused its discretion."  Instead, the statute

authorizes appellate courts to "increase, reduce, or otherwise modify a

sentence" "if it clearly and convincingly finds either of the following":

> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

R.C. 2953.08(G)(2).

## LEGAL ANALYSIS

{¶73} The Supreme Court of Ohio has recognized that R.C.

2953.08(G)(2) means that appellate courts ordinarily, " 'defer to trial courts'

broad discretion in making sentencing decisions.' " *State v. Collins*, 2024-

Ohio-2891, ¶ 22 (4th Dist.), quoting *State v. Gwynne*, 2023-Ohio-3851, ¶ 11.

(Citations omitted.)  As recently stated by the Supreme Court of Ohio in

*State v. Glover*, 2024-Ohio-5195, ¶ 39:

> That makes sense: the trial judge presided over the trial and heard the witnesses testify, the defendant made his allocution to the sentencing judge directly, and the trial judge will often have heard directly from the victims at sentencing. Thus, an appellate court's role is not to be a "second-tier sentencing court."

*Hill, supra*, at ¶ 31; *State v. Jones*, 2020-Ohio-6729, ¶ 41-42.

{¶74} In *State v. Hammons,* 2024-Ohio-6128, the Sixth District court recently provided a thorough discussion of the Supreme Court's decision in *Glover, supra*. "The Ohio Supreme Court has made it clear that 'an appellate court may not reverse or modify a trial court's sentence based on its subjective disagreement with the trial court.' " *Hammons, supra,* at ¶ 22, quoting *Glover,* 2024-Ohio-5195, ¶ 45 ("*Glover II*"). In *Glover II,* the Ohio Supreme Court reversed the First District's decision in *State v. Glover,* 2023-Ohio-1153 (1st Dist.) ("*Glover I*"). There, the trial court had imposed consecutive sentences for multiple counts of aggravated robbery and kidnapping at gunpoint, for an aggregate prison term of 60 years. The First District reversed the consecutive sentences after finding that the lack of physical harm to the victims, combined with appellant's lack of criminal history, undermined the trial court's proportionality determination. *Glover I* at ¶ 101. The First District compared the aggregate length of the appellant's sentence to the potential sentence for a single instance of violent crime, like murder, and observed that "a person who purposely takes another person's life ..." could be eligible for parole after 15 years, but the appellant "who did not take his victims' lives or cause them physical harm, would have no chance of parole at 15, 20, 25, or even 50 years." *Id.* at ¶ 98.

{¶75} In *Hammons*, the court noted that the Ohio Supreme Court found, among other things, that the First District erred because it did not "limit its review to the trial court's findings." *Glover II* at ¶ 57. *See Hammons*, ¶ 23. The *Glover* court noted that "[t]he court of appeals may have disagreed with the trial court's assessment of the magnitude of the harm inflicted by Glover, but this disagreement with the trial court's assessment is far different from concluding that the record clearly and convincingly does not support the trial court's consecutive-sentence findings." *Id.* at ¶ 55. In *Glover II*, the Supreme Court also found that the First District had "strayed from its role when it compared Glover's sentence to the sentences imposed under other statutes and in other cases" because the appellate review statute, R.C. 2953.08(G)(2), does not permit such a "comparative analysis[.]" *Id.* at ¶ 59.

{¶76} Thus, R.C. 2953.08(G)(2) provides that an appellate court may increase, reduce, or otherwise modify consecutive sentences only if the record does not "clearly and convincingly" support the trial court's R.C. 2929.14(C)(4) consecutive-sentence findings. The clear-and-convincing standard for appellate review in R.C. 2953.08(G)(2) is written in the negative. *Collins,* ¶ 22; *Gwynne*, 2023-Ohio-3851, at ¶ 13. Moreover, "clear and convincing evidence" is "that measure or degree of proof which is

more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶77} In general, a statutory presumption exists in favor of concurrent sentences pursuant to R.C. 2929.41(A) and R.C. 2929.14(C)(4) governs the imposition of consecutive terms of imprisonment. *Collins,* ¶ 23; *Glover, supra,* at ¶ 38. To justify the imposition of consecutive terms of imprisonment, "a trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but the court has no obligation to state reasons to support its findings." *State v. Blair,* 2019-Ohio-2768 ¶ 52 (4th Dist.), citing *State v. Bonnell,* 2014-Ohio-3177, syllabus. This Court explained the findings required to support the imposition of consecutive sentences:

> "Under the tripartite procedure set forth in R.C. 2929.14(C)(4), prior to imposing consecutive sentences a trial court must find that: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of three circumstances specified in the statute applies."

*Hill, supra,* ¶ 36, quoting *State v. Cottrill,* 2020-Ohio-7033, ¶ 14 (4th Dist.).

{¶78} Further, as we outlined in *Cottrill*, and more recently in *Collins*, the three circumstances are:

> "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."

*Cottrill* at ¶ 14, and *Collins*, ¶ 24, quoting R.C. 2929.14(C)(4)(a)-(c).

{¶79} The record must support any findings that the applicable statutory sentencing provisions require and made by the sentencing court, such as those contained in R.C. 2929.14(C)(4)(c).  *Collins*, ¶ 25; *State v. Drummond,* 2024-Ohio-81, ¶ 11 (4th Dist.).  Further, in *Drummond* we observed that the plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings, and to uphold the trial court's findings unless those findings are clearly and convincingly

not supported by the record. *Drummond* at ¶ 12. In *State v. Bonnell,* 2014-Ohio-3177, the Supreme Court of Ohio held, "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry[.]" *Id.* at ¶ 37.

{¶80} Appellant is correct that the statute number, R.C. 2929.14, is not explicitly set forth in the sentencing entry. On page three of the Uniform Sentencing Entry, a chart contains the following headings: count, sentence, length of term, mandatory and "consecutively with." The language at the bottom of page two of the sentencing entry states as follows:

> In fashioning the sentence(s) in this case, the Court has considered *the need to protect the public from future crime by the defendant and others, to punish the defendant,* and to promote the defendant's effective rehabilitation while using the minimum sanctions to accomplish those purposes without imposing an unnecessary burden on state or local government resources…*This sentence is commensurate with, and not demeaning to, the seriousness of the defendant's conduct and its impact on the victim, consistent with sentences for similar crimes by similar offenders*, and is in no way based on the defendant's race, ethnicity, gender, or religion.

{¶81} As is well-established, the trial court is not required to use "talismanic words," but, it must be clear from the record that it actually made the findings required by statute. *State v. Bonnell*, 2014-Ohio-3177, syllabus, at ¶ 37; *State v. Venes* at ¶ 14. The Supreme Court of Ohio further

explained that the word "finding" in this context means that the trial court "must note that it engaged in the analysis" and that it "considered the statutory criteria and specifie[d] which of the given bases warrants its decision." *Bonnell* at ¶ 26. As long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld. *Id.* at ¶ 29.

{¶82} This court is well-able to discern that the trial court engaged in the correct R.C. 2929.14(C)(4) analysis. Turning to the sentencing transcript, we note after the trial court recited R.C. 2929.11 and 2929.12 and listed the counts and felony levels, the trial court stated:

> The Court finds none of these offenses merge. *Consecutive sentences are necessary to protect the public. Punishment is not disproportionate. A single term does not adequately punish any of these offenses.*

{¶83} The trial court specifically identified all three of the factors listed in R.C. 2929.14(C). Neither appellant nor the record indicates any lack of analysis on the part of the trial court or any erroneous analysis of factors. Here, the sentencing entry reflects the factors listed in R.C. 2929.14(C)(4) that "The Court has considered the need to protect the public from future crime…and to punish the defendant," and that the "sentence is commensurate with, and not demeaning to, the seriousness of the

defendant's conduct and its impact on the victim, consistent with sentences for similar crimes by similar offenders," (which addresses proportionality). However, it does not appear that the trial court's statement at the sentencing hearing, that "A single term does not adequately punish any of these offenses," reflective of the trial court's analysis of the additional required third finding, in this case, R.C. 2929.14(C)(4)(b), made its way into the sentencing entry.

{¶84} Appellant's original sentence is not contrary to law simply because the third finding which the trial court made in open court was omitted from the final entry. Accordingly, the second assignment of error is without merit. However, we remand for the trial court to issue a resentencing hearing in order to incorporate all consecutive sentence findings announced at the sentencing hearing.

## ASSIGNMENT OF ERROR THREE - INEFFECTIVE ASSISTANCE OF COUNSEL

{¶85} Appellant argues that his counsel's deficient performance and lack of trial strategy fell below the prevailing professional norms beginning during the pretrial proceedings and continuing through sentencing. Appellant first argues that the record demonstrates that his trial counsel failed to adequately investigate his case, prepare for trial, prepare appellant, and prepare a coherent defense. Appellant also contends that his trial

counsel provided essentially no mitigation evidence, such as favorable

witnesses, letters of support, or effective argument.

STANDARD OF REVIEW

{¶86} "Upon direct appeal, appellate courts generally review

claims of ineffective assistance of counsel on a de novo basis, simply

because the issue originates at the appellate level; no trial court has ruled on

the issue.  Appellate courts review the trial record and are left to judge from

the bare record whether the assistance was effective." *State v. Blanton*,

2025-Ohio-237, ¶ 42 (4th Dist.), quoting *State v. Gondor,* 2006-Ohio-6679,

¶ 53.  "To establish constitutionally ineffective assistance of counsel, a

defendant must show (1) that his counsel's performance was deficient and

(2) that the deficient performance prejudiced the defense and deprived him

of a fair trial." *State v. Jenkins,* 2014-Ohio-3123, ¶ 15 (4th Dist.), citing

*Strickland v. Washington,* 466 U.S. 668, 687 (1984).  Failure to satisfy either

part of the test is fatal to the claim.  *See Strickland* at 697.  The defendant

"has the burden of proof because in Ohio, a properly licensed attorney is

presumed competent." *Gondor* at ¶ 62.

{¶87} " 'In order to show deficient performance, the defendant must

prove that counsel's performance fell below an objective level of reasonable

representation.' " *State v. Adams*, 2016-Ohio-7772, ¶ 89 (4th Dist.), quoting

*State v. Conway*, 2006-Ohio-2815, ¶ 95. When considering counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland* at 689, quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955). " 'To show prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.' " *Adams* at ¶ 89, quoting *Conway* at ¶ 95.

{¶88} In Ohio, a properly licensed attorney in Ohio is presumed competent. *State v. Quintero,* 2018-Ohio-5145, ¶ 38 (10th Dist.), citing *State v. Lott,* 51 Ohio St.3d 160, 174 (1990). The burden of proving ineffective assistance of counsel is on the defendant. *State v. Smith,* 17 Ohio St.3d 98, 100 (1985). Trial counsel is entitled to a strong presumption that his or her performance was adequate, and the attorney's action constituted sound trial strategy. To demonstrate prejudice, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

<u>LEGAL ANALYSIS</u>

{¶89} At the outset, we note that many of appellant's claims herein relate to matters outside the record. " 'We may not consider matters outside the record on a direct appeal. Instead, an appellant may raise matters outside the record by filing a postconviction relief petition in the trial court.' " *State v. Spires,* 2011-Ohio-3661, ¶ 30 (4th Dist.), quoting *State v. Hoke*, 2011-Ohio-1221 at ¶ 10 (4th Dist.); *See e.g. State v. Nichols*, 11 Ohio St.3d 40, 42 (1984). Therefore, for the reasons which will follow, we disagree that appellant's trial counsel's performance was deficient.

Alleged Failure to Investigate

{¶90} Appellant contends that his trial counsel failed to adequately investigate his case by pointing out that only "form motions" were filed on his behalf. Appellant also argues his counsel failed to discover additional defense witnesses, such as the other young people living in his home at the time of E.J. and Z.C.'s allegations. He asserts that additional testimony would have clarified the living arrangements or bolstered appellant's testimony.

{¶91} However, this record does not support the inference that appellant's trial counsel failed to investigate those persons or their potential testimony. " '[W]e cannot infer failure to investigate from a silent record.' " *State v. Ludwick,* 2017-Ohio-8463,¶ 39 (10th Dist.), quoting *State v.*

*Murphy,* 91 Ohio St.3d 516, 542 (2001).  *See also State v. Stanford,* 2023-Ohio-1515 ¶ 38 (2d Dist.).  And the decision to call or forego calling witnesses is a tactical decision which is within reasonable trial strategy. *Yaacov, supra,* ¶ 31; *State v. Edwards*, 119 Ohio App.3d 106, 110  (10th Dist.1997).  Appellant has not explained the substance of the additional suggested testimony or how said testimony would have changed the outcome of the proceeding.  *See generally State v. Biggs,* 2022-Ohio-2481, ¶ 30 (5th Dist.).  Merely asserting that additional witnesses' testimony would have affected the outcome of the trial is insufficient to satisfy appellant's burden of proving that his trial counsel was ineffective.  Finally,  the decision regarding which defense to pursue is a tactical decision, and appellate courts will not second-guess what may be tactical decisions by counsel.  *Yaacov, supra*, citing *State v. Evans,*  2005-Ohio-3847, ¶ 73 (8th Dist.)  Appellant's first argument hereunder is without merit.

Alleged Failure to Prepare for Trial

{¶92} Appellant contends that his attorney failed to communicate with him and failed to spend enough time in trial preparation.  Appellant cites the fact that  his counsel mentioned at his Thursday final pretrial hearing that trial preparation would begin, later in the day, which was five calendar days before trial.  A trial attorney's failure to communicate with his

or her client may rise to the level of deficient performance, depending on the circumstances.  *State v. Lawson*, 2020-Ohio-6852, ¶ 106 (2d Dist.).

{¶93} However, but for the brief discussion appellant has referenced above, no other related communications are reflected in the record.  "A claim of lack of communication between a defendant and his trial counsel is not one that can be borne out by the record.  It relies upon information necessarily outside the record and is therefore not an issue we can review on direct appeal." *Lawson, supra.*  Because the content of appellant's and defense counsel's communications are not fully detailed in the record, appellant's claim regarding lack of communication is more properly raised in a petition for post conviction relief.  This argument is also without merit.

Alleged Failure to Conduct Effective Cross-Examination

{¶94} Appellant contends that his trial counsel failed to effectively cross-examine E.J. and Z.C.  "In general, ' "[t]he scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." ' " *McKinney, supra,* at ¶ 42, quoting *State v. Spaulding*, 2016-Ohio-8126, ¶ 90, quoting *State v. Conway*, 2006-Ohio-2815, ¶ 101.  Furthermore, a defendant alleging that trial counsel performed deficiently during cross-examination "must identify the questions he believes [defense] counsel should have asked and must provide some

sense of the information that might have been elicited.  Otherwise, [courts] will presume that the choice to forgo cross-examination 'constituted a legitimate tactical decision.' "  *State v. Beasley*, 2018-Ohio-493, ¶ 155, quoting *State v. Frazier,* 2007-Ohio-5048, ¶ 220, and citing *State v. Foust*, 2004-Ohio-7006, ¶ 90 (holding that counsel made a legitimate tactical decision to forgo additional cross-examination where the defendant "fail[ed] to explain how further cross-examination of [the witness] would have made a difference in his case").

{¶95} Herein, appellant has not identified any particular questions that he believes trial counsel should have asked E.J. and Z.C.  He does not provide any sense of the information that counsel might have elicited if he had asked additional questions.  And, given the nature of the allegations involving minor victims, trial counsel likely made a strategic choice not to appear combative and thus create possible sympathy in the minds of the jurors.  Appellant's argument herein is also without merit.

Alleged Failure to Introduce Exhibits

{¶96} Appellant simply mentions "exhibits," without identifying or explaining what these alleged exhibits are, what they consisted of, and how they would help his case.  This is appellant's most speculative contention of all.  And again, any exhibits, assuming they do exist, are not part of the

record on appeal.  Without the exhibits, we cannot determine whether the exhibits would have affected the outcome of the trial and thus whether appellant was prejudiced by defense counsel's failure to obtain them and use them at trial.  Again, this claim cannot be reviewed on direct appeal. Appellant's argument regarding the exhibits is also without merit.

Failure to Object

{¶97} Appellant contends that his attorney failed to object to hearsay testimony that indicated to the jury that there was another victim. On  redirect, the prosecutor questioned  S.R. as follows:

> Q:     [J]ust to clarify, H. told you that something
>         inappropriate had happened to E. and Z. or
>         happened to him?
>
> A:     Happened to him.

{¶98} " '[A] failure to object, in and of itself, does not rise to the level of ineffective assistance of counsel.' " *State v. Ryan,* 2009-Ohio-3235, ¶ 77 (10th Dist.), quoting *State v. Jackson*, 2006-Ohio-174, ¶ 88 (8th Dist.). Unfortunately, the above testimony occurred after appellant's counsel elicited the following testimony from S.R. on cross-examination:

> Q:     [W]hen you were at the Fairmont home, were you
>         aware, was, Z.C. or E.J. or G.R. was any other,
>         people your age coming around?
>
> A:     Yes.

Q:    *[D]id you ever see anything inappropriate
      happening between Mr. Cheatham and any of
      these others that were coming around?*

A:    *I never seen it but H. did tell me something
      inappropriate happened.*

Q:    *But you  never saw anything?*

A:    *No.*

{¶99}  Appellant's counsel opened the door to damaging testimony. However, we find this error to be harmless.[6]  Counsel's subsequent failure to object to the hearsay that followed, no doubt, was a tactical decision.  Any objection would certainly have further emphasized the unfavorable testimony, that there may have been another alleged incident or victim. However, even if counsel were deficient for failing to object, appellant has not shown that but for the damaging testimony, he would not have been convicted of the counts.  And, while the question that led to the hearsay testimony was error, we find it to be harmless.  Appellant's argument herein is without merit.

Alleged Failure to Argue for Lesser Included Jury Instruction**.**

---

[6] Harmless error review requires: (1) that the defendant be prejudiced by the improper admission of the evidence, (2) that the appellate court believe the error was not harmless beyond a reasonable doubt, and (3) upon excising the improper evidence, a determination whether the remaining evidence overwhelmingly supports the defendant's guilt.  *State v. O'Connell*, 2020-Ohio-1369 ¶ 31 (1st Dist.).  *See State v. Morris*, 2017-Ohio-5052, ¶ 27-29.  Based upon our review of appellant's arguments, even without the damaging question, response, and lack of objection, we find overwhelming other evidence in the record is such that any rational trier of fact could have found the state proved all elements of the nine counts beyond a reasonable doubt.

{¶100} Appellant contends since his trial counsel argued in Crim.R. 29 that the element of force was not proven, counsel should have requested jury instructions on the lesser-included offense of Sexual Imposition, R. C. 2907.06.  Appellant points out that Gross Sexual Imposition, R.C. 2907.05(A)(1), a fourth-degree felony, carries a possible maximum prison term of 18 months, while Sexual Imposition, R.C. 2907.06(A)(1), is a misdemeanor of the third degree punishable by up to not more than 60 days in jail.  By failing to request instructions on the lesser-included offense, appellant concludes his counsel fell below the objective standard of reasonableness.  There is no dispute that Sexual Imposition, R.C. 2907.06(A)(1), is a lesser-included offense of Gross Sexual Imposition, R.C.2907.05(A)(1).  *See State v. Franco,* 2023-Ohio-4653, ¶ 27 (8th Dist.) This argument pertains to Counts One, Two, Seven, Eight, and Nine.

{¶101} " 'Generally, a failure to request a jury instruction on a lesser-included offense is presumed to be a matter of trial strategy.' " *State v. Kozee*, 2025-Ohio-364, ¶ 20 (4th Dist.), quoting *State v. Vogt,* 2018-Ohio-4457, ¶ 119 (4th Dist.).  As noted above, a properly licensed attorney is presumed to execute his duties competently.  Further, " 'tactical or strategic trial decisions, even if ultimately unsuccessful, do not generally constitute ineffective assistance of counsel.' " *Kozee, supra,* quoting *State v. Rizer,*

2011-Ohio-5702, ¶ 37 (4th Dist.), citing *In re Wingo,* 143 Ohio App.3d 652, 668 (4th Dist. 2001). Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Vogt* at ¶ 122. Moreover, as the Supreme Court of Ohio highlighted:

> [w]hen the alleged error concerns what could be viewed as trial strategy, courts must be "highly deferential" to the attorney's strategic decisions. *Strickland,* 466 U.S. at 689. After all, each case is unique and capable of being argued in a variety of ways. *See id.* at 689-690. Nobody can predict the future, and "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. Hindsight is 20/20 after all. Accordingly, the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.,* quoting *Michel v. Louisiana,* 350 U.S. 91, 101 (1955).

*State v. Lloyd,* 2022-Ohio-4259, ¶ 17, cert. denied, 143 S. Ct. 2649 (2023).

{¶102} During appellant's testimony, he repeatedly denied any inappropriate sexual contact with any of the three alleged victims. Appellant attempted to discredit E.J. and Z.C. by portraying them as "free-loaders" who made sexual comments to everyone, including him, and thereafter made false claims to retaliate when appellant asked them to contribute to household bills. Appellant attempted to discredit S.R. by indicating that S.R. disliked sleeping alone and misconstrued things; they didn't have a

good relationship when she reached puberty; and that she was promiscuous with a girlfriend she brought to his home and a boyfriend she moved away with. Based on appellant's testimony, it appears defense counsel's strategy, that no sexual contact occurred with any of the victims, was an all-or-nothing approach.

{¶103} In *State v. Blanton,* 2018-Ohio-1278 ¶ 128 (4th Dist.), this Court observed:

> [o]ften times, with respect to "lesser-included offenses," defense counsel will make the strategic decision not to request a lesser-included offense jury instruction in the hopes that the jury will outright acquit the defendant on the charged offense, having not been given the option to find guilt as to the lesser-included offense.

*See also, Kozee, supra,* ¶ 22. Appellant refused a plea offer prior to trial and maintained his innocence throughout trial and sentencing. Any request for a lesser-included instruction would have undercut his protestations of innocence to all nine counts. Appellant's counsel was not deficient for failing to request the lesser-included instruction as to Counts One, Two, Seven, Eight, and Nine, which would have undermined the entire defense strategy as to those counts. This argument is also without merit.

Alleged Failure to Present Mitigation Evidence at Sentencing

{¶104} Appellant also argues that his trial counsel was ineffective due to a failure to present evidence of mitigation at sentencing. Appellant

contends that counsel's obligation was to provide the court with insight into his life including adolescence and upbringing, education and employment history, and physical and mental health. Appellant points out that his counsel did not call witnesses, obtain letters of support, point out appellant's good standing as an employee, or point out his longtime residency in Jackson County. Appellant concludes that when a client has been convicted and faces the possibility of a lengthy sentence, it simply cannot be strategic to forgo presenting any information, exhibits, witnesses, or argument in mitigation.

{¶105} We disagree. Again, appellant fails to identify who would have testified or written letters on his behalf. Likewise, appellant fails to explain the mitigating nature of the content of any evidence regarding his upbringing, education, employment history, and physical and mental health. In *Ludwick, supra,* Ludwick argued that his counsel should have investigated and presented mitigating evidence regarding Ludwick's psychological condition as related to his gambling addiction. The appellate court, however, found that the record did not support the inference that Ludwick's counsel failed to investigate those allegedly mitigating issues or circumstances. The appellate court wrote, "Nor can we conclude that evidence that could have been produced from such an investigation about

Ludwick's asserted gambling addiction would have supported a "reasonable probability" of a different outcome at trial or sentencing.  *See Griffin* at ¶ 42, quoting *Bradley* at paragraph three of the syllabus.

{¶106} In *Quintero*, *supra*, the appellate court declined to find defense counsel's performance was deficient based on counsel's brief statement on his client's behalf and failure to present testimony from a mitigation expert.  The appellate court noted that even if counsel's performance at sentencing could be considered deficient, Quintero did not demonstrate prejudice as a result.  *See State v. Hayes,* 2009-Ohio-1100, ¶ 31 (10th Dist.).  Quintero failed to identify what the mitigation evidence would have been and failed to show how mitigating evidence would have resulted in a lesser sentence.  The *Quintero* court was unwilling to speculate the outcome of sentencing would have been different.  *See also State v. Wade*, 2020-Ohio, ¶ 9 (10th Dist.).

{¶107} At sentencing, appellant still did not admit guilt or take responsibility.  His counsel spoke on his behalf as follows:

> Your Honor, Mr. Cheatham still…he has maintained his innocence throughout this action. He still maintains it to this day…He exercised his Constitutional rights to a jury trial…In this country we don't punish people for exercising their rights…I would like to remind the Court that…the last offer prior to heading into trial as seven and a half years…[J]ust to keep that in the Court's mind that the State would have been happy with that prior

to a trial and him exercising his rights…Mr. Cheatham also does have a statement he has prepared. He wishes to make to the Court.

{¶108} Thereafter, appellant made his own lengthy statement, which is five full pages of the transcript. Appellant began by professing his innocence and then continued, incredibly, disparaging the victims, his trial counsel, and counsel's professional advice. Appellant also told the trial court he had "bartered for protection with sex" during his pretrial incarceration. Many of the claims appellant made about his trial counsel, as discussed at length herein, were matters not properly before the court or part of the record. And even if his counsel had performed all subsequently requested measures appellant now suggests, we can only speculate as to whether or not appellant would still have chosen to make the same lengthy rant which did not serve, in any way, to support mitigation.

{¶109} Here, we fail to see how appellant's counsel's failure to introduce evidence in mitigation would have led to a different outcome. Moreover, given appellant's continued denial of any criminal conduct, presentation of mitigation evidence is not congruent with an innocence argument. Based on the foregoing, we find appellant's counsel was not deficient for failing to introduce evidence in mitigation at sentencing.

Cumulative error

{¶110} "Under the cumulative-error doctrine, 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal.' " *State v. Martin,* 2024-Ohio-2334, ¶ 110 (4th Dist.), (citation omitted), quoting *State v. Garner,* 74 Ohio St.3d 49, 64, (1995). "Before we consider whether 'cumulative errors' are present, we must first find that the trial court committed multiple errors." *State v. Smith,* 2016-Ohio-5062, ¶ 106 (4th Dist.). Based upon the foregoing, we cannot find multiple errors. We have only found one, which we have determined to be harmless. The cumulative error doctrine does not apply where only one harmless error has been found. *See State v. Colonel,* 2023-Ohio-3945, ¶ 66 (4th Dist.), citing *State v. Ludwick, supra*, ¶ 53-57; *State v. Spring,* 2017-Ohio-768, ¶ 59 (7th Dist.). Appellant's cumulative error argument is also without merit.

{¶111} Based on the foregoing, appellant's third assignment of error regarding the performance of his trial counsel is overruled.

CONCLUSION

{¶112} Based on the foregoing, we hereby overrule appellant's First, Second, and Third Assignments of Error. However, as to Assignment of Error Two, the matter is remanded in order that the trial court may include

the third required consecutive sentence finding which was discussed at the original sentencing hearing.  As to appellant's Fourth Assignment of Error, the argument as to Count Three is sustained.  Therefore, appellant's conviction as to Count Three is vacated. The Fourth Assignment of Error is overruled as to all other contentions.

In light of our discussion regarding appellant's consecutive sentence under Assignment of Error Two, and the vacated count as discussed in Assignment of Error Four, this matter is remanded to the trial court for resentencing consistent with this opinion.

**JUDGMENT AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

## JUDGMENT ENTRY

It is ordered that the JUDGMENT BE AFFIRMED IN PART, REVERSED IN PART, AND REMANDED, and costs be assessed to appellee.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio.  Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. and Wilkin, J. concur in Judgment and Opinion.

For the Court,

_____
Jason P. Smith
Presiding Judge

**NOTICE TO COUNSEL**
**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**